IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

ROBERT D BENNETT,          )
                                     )
                                     )          Case No.: 09 C 50276
                    Plaintiff,      )
                                     )
                                     )          Hon. P. Michael Mahoney
                  v.               )          U.S. Magistrate Judge
                                     )
MICHAEL J. ASTRUE      )
Commissioner of Social Security.      )
                                     )
                    Defendant,    )

## MEMORANDUM OPINION AND ORDER

### I.      Introduction

Robert D. Bennett seeks judicial review of the Social Security Administration

Commissioner's decision to deny his application for Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of

the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before the magistrate judge

pursuant to the consent of both parties, filed on December 14, 2009. *See* 28 U.S.C. § 636(c);

Fed. R. Civ. P. 73.

### II.      Administrative Proceedings

Claimant first filed for DIB on November 29, 2006, and for SSI on December 8, 2006.

(Tr. 210, 214.) He alleges a disability onset date of April 30, 2004. (Tr. 210, 216.) His claim

was denied initially and on reconsideration. (Tr. 157, 163, 168.) The Administrative Law Judge

("ALJ") conducted hearings into Claimant's application for benefits on December 2, 2008. (Tr.

1

107.)  At the hearing, Claimant was represented by counsel and testified.  (Tr. 107.)  Dr. Norris

Dougherty, a Medical Expert (hereinafter referred to as "ME") and William Schweihs, a

Vocational Expert (hereinafter referred to as "VE") were also present and testified.  (Tr. 107.)

The ALJ issued a written decision denying Claimant's application on March 4, 2009, finding that

Claimant was able to perform jobs that exist in significant numbers in the national economy.

(Tr. 104, 107.)  Because the Appeals Council denied Claimant's Request for Review regarding

the ALJ's decision, that decision constitutes the final decision of the Commissioner.  (Tr. 1.)

## III.    Background

At the hearing, Claimant testified to the following:

He was 44 years old, married, and had one ten year old child.  (Tr. 109.)  Claimant was

living with friends from his church in an apartment due to marital issues, but expected to be

moving back home.  (Tr. 109-10.)  He was approximately 5' 7" and 240 pounds.  (Tr. 109.)  He

completed high school through tenth grade, and later completed a GED program and attended

some college courses.  (Tr. 112.)  He did not have a driver's license because of prior DUI's, and

was attending court-ordered alcohol rehabilitation.  (Tr. 110.)

Claimant described drinking alcohol once or twice a month, but having behavioral issues

when he would drink.  (Tr. 111.)  He was on probation for a domestic incident that occurred

between Claimant and his wife.  (Tr. 108, 111.)

Claimant's previous work was described as computer hardware support.  (Tr. 113.)  His

prior work included having been a network administrator for a church organization, an

administrative assistant at an actuarial firm, a computer technician at a furniture chain, and an

apprentice technician at a car dealership.  (Tr. 113-14.)  He explained that he could no longer do

the computer work because of the level of stress involved. (Tr. 114.)

Claimant reported taking Prozac and Buspirone for anxiety and Zyprexa to treat his bipolar disorder, though he was not seeing a psychiatrist or psychologist because they would not take his medical card. (Tr. 114, 125.) He received prescriptions for his medications from his general physician and a doctor at Crusader Clinic. (Tr. 125.) Claimant had attempted to get help from the Janet Wattles Center, but they would not treat him because of his alcohol use. (Tr. 115.) He was also in an outpatient support program for alcohol addiction, though he denied being an alcoholic. (Tr. 115-16.) Claimant described being a binge drinker who would drink one or two times a month. (Tr. 118.) He stopped drinking in August 2008. (Tr. 118.) He continued to smoke about half a pack of cigarettes per day. (Tr. 119.) He has attempted to get into an anger management class because he felt he needed it. (Tr. 120.) He reported feeling depressed, and had thoughts of hurting himself in the past but was never ready to act on them. (Tr. 127.)

Claimant described his heart problems as causing him fatigue and angina, which he sometimes confused with heart attacks. (Tr. 119.) He could not do anything on his feet for any length of time, and experienced shortness of breath. (Tr. 119.) He had sleeping problems and started using a CPAP machine which allowed for some improvement. (Tr. 119.) Claimant took naps daily because of his fatigue. (Tr. 119.) He had a heel spur on his left foot that would not allow him to walk long distances and made stairs painful. (Tr. 122.) He was not able to receive a cortisone shot because he also has diabetes. (Tr. 122.) Due to knee and leg pain, Claimant was unable to stand for more than seven to ten minutes, and could only sit comfortably for about fifteen minutes. (Tr. 129.) Claimant had upcoming doctor appointments with Dr. Gollum, his

regular physician, and with a cardiologist and a gastroenterologist.  (Tr. 132.)  His blood pressure was described as being borderline high.  (Tr. 134.)

Though he was not living at home at the time of the hearing, Claimant stated that when he was at home he could not do any housework.  (Tr. 119.)  He receives help from his ten-year-old and some friends, but the house and yard remain a mess.  (Tr. 120.)  He rides to the grocery store but usually does not go in because he cannot walk around the store.  (Tr. 121.)  Claimant went to church sometimes with the friends he was staying with, but he was not able to sit through an entire service due to pain in his knees and back.  (Tr. 122-23.)  His busiest day included going to therapy in the morning, coming home and eating, taking an afternoon nap, and watching television with his son before going to bed.  (Tr. 131.)

Since his alleged onset date of April 2004, Claimant attempted to work on two occasions.  (Tr. 125.)  The first attempt was a tech job at a bank in Iowa, but he had to leave the job after a hospital stay related to his heart condition.  (Tr. 125.)  The second attempt was through a temporary hiring firm in Freeport, Illinois.  (Tr. 125.)  He was unable to perform more than one forty hour week at the temp job because of his medical condition and a hospital stay for pneumonia and gastric ulcers.  (Tr. 126.)

The ME testified that Claimant's sleep apnea was controlled fairly well with his CPAP machine.  (Tr. 134.)  The ME described Claimant's two proven problems as producing overlapping symptoms that lead to Claimant getting admitted to the hospital.  (Tr. 134.)  Claimant experiences chest pain that must be treated as a heart issue, but its cause may instead be related to his diagnoses of reflux esophagitis and gastric ulcers.  (Tr. 134-35.)  The ME believed that Claimant's gastrointestinal issues would respond fairly well to Nexium and antacid.

(Tr. 135.) The ME noted that Claimant also was overweight, diabetic, had high cholesterol, and probably had some depression, indicating that he had "all the risk factors." (Tr. 135.) According to the ME, none of Claimant's conditions appeared to rise to a listings level, but the ME wondered about the combination of factors. (Tr. 135.) The ME was unable to attribute Claimant's fatigue to his heart problem, noting that Claimant's cardiac ejection fraction was only slightly below normal. (Tr. 137.) The ME noted that there was a psychiatric component to Claimant's condition, but could not elaborate other than to state that "if I had his problems, I think I'd be depressed too." (Tr. 138.)

The ME testified that Claimant was capable of sedentary work. (Tr. 136.) Claimant could stand for two out of eight hours with rest periods, lift no more than 10 pounds regularly and 20 pounds occasionally, would have to have a sit/stand option, could perform bending and lifting, and would have to avoid unprotected heights or work around moving machinery. (Tr. 136.) As to the sit/stand option, the ME stated that Claimant might have trouble sitting for longer than 20 minutes at a time due to the general aches and pains he appears to have.

The VE testified that someone with Claimant's age, education, and work experience who could perform the entire universe of exertional or non-exertional work except that he be limited to lifting and carrying 20 pounds occasionally, 10 pounds regularly, could stand and walk for two out of eight hours in divided periods, could sit six out of eight hours with a sit/stand option, could not work around unprotected heights or dangerous moving machinery, and was limited to simple routine tasks with only occasional contact with the general public could not perform Claimant's past relevant work. (Tr. 147.) The VE could not cite to any jobs that Claimant could perform based on the above assumptions. (Tr. 147.) If the restriction on contact to the general

public and co-workers was removed, Claimant would be capable of production jobs such as assembly, packaging, visual inspection, and cashier positions. (Tr. 147-48.) There were at least 3,000 of each category of job listed in Illinois. (Tr. 148.)

The VE explained that a person would have to sit for about 20 to 30 minutes in order to perform the jobs he listed because more frequent standing could have an effect on a person's ability to work at a consistent pace. (Tr. 148.) If a person were only able to sit for 15 minutes without having to stand up, the VE opined that such a person would not be capable of the work he listed. (Tr. 149.) Because of the unskilled nature of the work, the VE believed that a person could not be absent for more than a day to a day-and-a-half per month on a regular basis. (Tr. 149.)

## IV.     Medical Evidence

Claimant was admitted to the emergency room of Swedish American Hospital on August 22, 2004 complaining of chest pain that he had primarily experienced on the previous day. (Tr. 337.) It was noted that Claimant had a long-term history of coronary artery disease. (Tr. 337.) He reported taking Prevacid, Toprol[1], lisinopril[2], Lipitor[3], and aspirin. On August 23, 2004, Claimant underwent a left heart catheterization, selective coronary angiography, left ventricular

---

[1]Toprol (Metoprolol) is used to treat high blood pressure, to prevent chest pain, and to improve survival after a heart attack. PubMed Health, Metoprolol, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000795/ (last reviewed June 28, 2011).

[2]Lisinopril is used to treat high blood pressure, and in combination with other medications to treat heart failure. PubMed Health, Lisinopril, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000917/ (last reviewed June 28, 2011)

[3]Lipitor (Atorvastatin) is used in combination with diet, exercise, and weight loss to reduce the risk of heart attack and stroke in people who have heart disease or are at risk for heart disease. PubMed Health, Atorvastatin, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000009/ (last reviewed June 28, 2011)

angiography, and percutaneous coronary intervention of the left circumflex coronary artery. (Tr. 345.) He was diagnosed with a non-ST elevation myocardial infarction and coronary intervention of the left circumflex coronary artery. (Tr. 340.) Claimant received stents in the right coronary artery, and was noted to have non-obstructive lesions in the distal left circumflex coronary artery. (Tr. 346.) Claimant was given ReoPro[4] for 12 hours following his procedure, was prescribed Plavix[5] for one year, and advised to continue taking aspirin for the rest of his life. (Tr. 347.) At a follow up appointment on September 10, 2004, Dr. Zubair M. Syed, M.D., observed that Claimant's blood work revealed a diagnosis of Type II diabetes, and that Claimant had a history of anxiety, depression, gastroesophageal reflux disease, and obesity. (Tr. 353.)

Claimant had a number of follow-up visits with Dr. Jocelyn Go-Lim, M.D., throughout 2005. In addition to his heart and blood pressure conditions, Dr. Go-Lim observed during various appointments that Claimant experienced bipolar depression, anxiety, bilateral knee pain with reduced range of motion, panic attacks, acute bronchitis, acute sinusitis, acute pharyngitis, increased weight, hemorrhoids, and hyperglycemia. (Tr. 348, 438-52, 455-58, 463, 469.) Dr. Go-Lim increased Claimant's Toprol prescription for his blood pressure and prescribed

---

[4]ReoPro (Abciximab) is a drug used as an adjunct to percutaneous coronary intervention for the prevention of cardiac ischemic complications. RxList.com, ReoPro, *available at* http://www.rxlist.com/reopro-drug.htm (last reviewed June 28, 2011).

[5]Plavix (Clopidogrel) is an antiplatelet drug used to prevent strokes and heart attacks in patients at risk for these problems. PubMed Health, Clopidogrel, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000040/ (last reviewed June 28, 2011).

additional medications for Claimant, including Ativan for anxiety, Effexor[6], and Buspirone[7].

(Tr. 452.)  Claimant saw Dr. Go-Lim on five occasions between January 10, 2006 and March 22,

2006.  Though the symptoms were primarily related to his sinusitis and pharyngitis, notations

also appear regarding Claimant's hypertension, knee pain, and diabetes.  (Tr. 412-28.)  Claimant

returned to see Dr. Go-Lim on April 18, 2006, and reported that he was experiencing sustained

left knee pain resulting from a fall on stairs.  (Tr. 409.)  Claimant's blood-sugar readings had

been running high and he was advised to return in May 2006 for blood and urine testing.  (Tr.

409.)

On May 10, 2006, Claimant was admitted to Saint Anthony Medical Center complaining

of chest pain he experienced while driving his lawnmower.  (Tr. 534.)  Myocardial infarction

was ruled out but tests were positive for ischemia and scar.  (Tr. 534.)  Cardiology testing

revealed dilated cardiomyopathy with at least moderate impairment of left ventricular systolic

function disproportionate to the greater coronary artery disease, mild mitral insufficiency, and

diastolic dysfunction.  (Tr. 550.)  Claimant underwent a successful angioplasty and stent

replacement.  (Tr. 550.)  Claimant followed up with Dr. Go-Lim at appointments on June 1,

2006, who noted that in addition to Claimant's recent angioplasty, Claimant's blood-sugar

readings continued to fluctuate and that claimant had hypercholsterolemia.  (Tr. 404.)  Claimant

---

[6]Effexor (Venlafaxine) is used to treat depression, and may also be used to treat generalized anxiety disorder, social anxiety disorder, and panic disorder.  PubMed Health, Venlafaxine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000947/ (last reviewed June 28, 2011).

[7]Buspirone is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety.  PubMed Health, Buspirone, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000876/ (last reviewed June 28, 2011).

was again admitted to Saint Anthony Medical Center with complaints of chest pain on June 12, 2006, but tests were negative for myocardial infarction and ischemia. (Tr. 575-76.)

On August 30, 2006, Claimant reported tiredness and pain in his lower extremities to Dr. Go-Lim. (Tr. 397.) Dr. Go-Lim suggested a lower extremity arterial Doppler study, which Claimant underwent on September 18, 2006. (Tr. 505.) The study ruled out arterial insufficiency as a cause of the pain. (Tr. 505.) On September 6, 2006, Claimant saw Dr. Go-Lim with an infected wound on his left foot, which was eventually diagnosed as a non-healing ulcer. (Tr. 394, 504.) At a September 13, 2006 appointment regarding the foot ulcer, Dr. Go-Lim noted that the wound had increased in size and that Claimant's diabetes and coronary artery disease were not well controlled. (Tr. 391.) On September 18, 2006, Claimant saw Dr. Kenneth Stevens for a follow-up on his recent angioplasty. (Tr. 584-86.) Dr. Stevens found that Claimant was doing fairly well, and advised him to continue to follow up with Dr. Go-Lim regarding his psychiatric medications. (Tr. 586.)

On September 20, 2006, Claimant visited Dr. Go-Lim to check up on his non-healing ulcer. (Tr. 388.) Dr. Go-Lim noted that the ulcer was not healed, that Claimant had been attempting to control his diabetes through his diet until a recent binge drinking episode, and that Claimant felt depressed about the drinking. (Tr. 388.) Claimant's condition was largely improved at an October 5, 2006 appointment, though it was noted that he had a lesion on his left temple. (Tr. 383.) No significant items were contained in the notes of Claimant's visits with Dr. Go-Lim in October and November 2006, aside from the continued attempts to treat the foot ulcer. (Tr. 373, 377, 380.) On November 9, 2006, Dr. Michael J. Kikta, M.D. F.A.C.S. performed a debridement procedure on Claimant's ulcer, and the wound was reported to be

healed on December 19, 2006. (Tr. 592-94.) On January 10, 2007, Dr. Go-Lim noted that Claimant's blood-sugar was much better and that he had recently returned to work. (Tr. 368.) Claimant reported feeling better about himself and there was no mention of the foot ulcer. (Tr. 368.)

On February 12, 2007, Claimant underwent a psychological consultative examination by Dr. John Peggau, Psy. D. on a referral from the State Agency. (Tr. 598.) Dr. Peggau's notations are unremarkable, with the possible exception of a note that Claimant had low self esteem that facilitated his dysthymic disorder or depression. (Tr. 587-600.) Dr. Peggau diagnosed Claimant with dysthymic disorder in the form of alcohol dependence, personality disorder with narcissistic features, and a current GAF score of 53[8]. Dr. Peggau noted that Claimant was able to understand, remember, sustain concentration, and persist in tasks, and was able to interact socially and adapt to work settings. (Tr. 600.)

On February 14, 2007, Dr. Kamlesh Ramchandani, a State Agency physician, performed a medical examination of Claimant. (Tr. 602.) Claimant reported feeling a constant fatigue with shortness of breath associated with tasks such as showering, walking for one block, or climbing one half a flight of stairs. (Tr. 602.) Dr. Ramchandani observed that multiple reports indicated that Claimant's ejection fraction was at 60%. (Tr. 603.) Dr. Ramchandani found that Claimant had coronary artery disease with atypical chest pain and a negative coronary angiogram, Type II non-insulin dependent diabetes mellitus with dislipidemia, a history of alcoholism and bipolar

---

[8]The ALJ used a Multiaxial Assessment method, where at Axis V a Global Assessment of Functioning ("GAF") Scale is used to report on a patient's overall functioning considering his psychological, social, and occupational functioning. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in psychological, social, and occupational functioning. *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. TR).

disorder, obesity, and malaise related to multiple factors.  (Tr. 603.)

On February 16, 2007, a Psychiatric Review Technique form was completed by State Agency physician Dr. Elizabeth Kuester, M.D.  (Tr. 606.)  Dr. Kuester found that Claimant had non-severe impairments including dysthymic disorder, narcissistic features, a substance abuse disorder with self reported remissions and decreases.  (Tr. 606-14.)  Claimant was marked as having a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (Tr. 616.)

On March 5, 2007, Dr. Towfig Arjmand, M.D., a State Agency reviewing physician, filled out a Physical Residual Functional Capacity Assessment ("RFC") on Claimant.  (Tr. 627.) Dr. Arjmand found that Claimant could: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and push and/or pull without limitation.  (Tr. 621.)  Claimant was found to have no postural, manipulative, visual, or communicative limitations, and was environmentally limited to the extent that Claimant should avoid concentrated exposure to extreme heat or cold.  (Tr. 622-24.)

Claimant had a number of other medical visits in March 2007.  Claimant saw Dr. Stevens on March 7, 2007.  (Tr. 658.)  Dr. Stevens noted that Claimant reported having recurrent anginal symptoms over the past three months that were increasing in frequency and severity.  (Tr. 658.) Dr. Stevens performed a left heart catheterization, coronary angiogram, and ventriculogram, which revealed no significant coronary artery disease, moderate impairment of left ventricular systolic function with borderline left ventricular dilatation, and mild mitral insufficiency and

diastolic function with an ejection fraction in the 30% range. (Tr. 663.) Dr. Stevens noted that Claimant should be admitted to the hospital as soon as possible. (Tr. 663.) On March 14, 2007, Claimant was evaluated for shoulder pain, and it was found that he had impingement anatomy and hypertrophic changes at the AC joint with degenerative edema, rotator cuff tendinosis, possible complete tear related to the distal mid cuff, and an element of bursitis. (Tr. 693.) Claimant was seen on March 21, 2007 at Saint Anthony Medical Center for headache, blurred vision, and lower extremity weakness. (Tr. 695-98.) A CT scan and CT angiogram of Claimant's brain came out normal, and he was admitted to the telemetry unit of the hospital. (Tr. 698.) Claimant was eventually evaluated consistent with his previous diagnoses. (Tr. 699.)

On June 6, 2006, Claimant presented at St. Luke's Hospital in Cedar Rapids, Iowa, with chest pain described as prolonged episodes of discomfort. (Tr. 783.) Claimant was admitted to the hospital for observation and discharged on June 8, 2007. (Tr. 783-89.) The findings from the visit were unremarkable and it was believed that the symptoms may have been related to Claimant's acid reflux or diabetic gastroparesis. (Tr. 783.) He was admitted again to St. Luke's Hospital on June 10, 2007 after having been brought to the hospital by unknown persons while he had been binge drinking. (Tr. 791.) The emergency room physician found that Claimant was intoxicated and going in and out of rapid atrial fibrillation, but Claimant later spontaneously converted into a normal sinus rhythm. (Tr. 791, 794.) Claimant was again held for observation and underwent a left heart catheterization, coronary arteriography, and ventriculography on June 12, 2007. (Tr. 800.) No significant obstructive disease was noted and the findings otherwise appear to be consistent with Claimant's previously observed conditions. (Tr. 801.) Claimant was seen at St. Luke's for a third time on June 14, 2007 because the area where the IV had been

administered on his previous visits had become infected. (Tr. 796.) He was prescribed an antibiotic and released. (Tr. 796.)

Claimant had continued seeing Dr. Go-Lim on a monthly basis between March and August of 2007. (Tr. 718-26.) Among the symptoms and findings discussed were his hypertension, diabetes, neck pain and headaches secondary to a whiplash injury, right shoulder pain, sinusitis, follow-up from pneumonia, follow-up on Claimant's hand infection, follow-up on a different hand laceration, and the need to stop smoking. (Tr. 718-26.) Claimant also followed-up with Dr. Stevens on June 21, 2007. (Tr. 630.) Dr. Stevens' impressions were consistent with Dr. Go-Lim's, except that Dr. Stevens explored the idea of adding a beta-blocker medication to Claimant's regimen based on Claimant's recent issues with atrial fibrillation, and ordered a Holter monitor. (Tr. 631.) The Holter monitor took place in July 2007 and revealed rare premature atrial contractions and rare premature ventricular contractions, but no sustained dysrhythmia or atrial fibrillation. (Tr. 628.) Claimant's ejection fraction was calculated at 60%. (Tr. 633.)

Claimant was seen at the Rockford Cardiology Associates lipid clinic under the direction of Dr. Paul M. Christensen, M.D., F.A.C.C., for help with his cholesterol management. (Tr. 768.) It was noted that Claimant's Illinois Public Aid insurance would not cover his cholesterol medications so he was prescribed fenofibrate and simvastatin, generic versions of his prior medications. (Tr. 768.) The findings of the clinic were that Claimant had type 2 diabetes millitus, hypertension, coronary artery disease, and mixed dyslipidemia with elevated total cholesterol, triglycerides, LDL cholesterol, and low HDL cholesterol. (Tr. 768.) It was recommended that Claimant increase his dosage of metformin for his diabetes. (Tr. 768.)

On August 17, 2007, Claimant was admitted to Saint Anthony Hospital for atrial fibrillation. (Tr. 768.) The treating physician noted that Claimant had a history of alcohol-related atrial fibrillation, advised Claimant to avoid alcohol, and did not prescribe any new medication. (Tr. 771.) Claimant visited the emergency room at Saint Anthony on October 23, 2007, where he complained of chest pain and arm numbness related to walking up stairs. (Tr. 642.) He was admitted overnight and an electrocardiogram was performed showing depressed left ventricular function and an ejection fraction of 43%. (Tr. 642.) Claimant's chest pain resolved on its own and the impression was that the symptoms were most likely related to acid reflux disease. (Tr. 641-43.)

On October 17, 2007, Claimant was seen at Rockford Memorial Hospital with a chief complaint of depression, which Claimant's wife described as having gotten progressively worse. (Tr. 996.) Claimant stated that he had been avoiding alcohol for six months, but that he had been drinking the morning of this visit. (Tr. 996.) He stated that he was depressed but that he was not seeing things or hearing voices. (Tr. 996.) A social worker and psychiatrist met with Claimant and found that he was non-suicidal, so he was discharged with instructions to follow-up with Dr. Go-Lim. (Tr. 998.) It was also suggested that Claimant may have hypothyroidism. (Tr. 998.) He was advised to seek treatment for his alcohol addiction. (Tr. 998.)

Claimant underwent a mental health assessment at the Janet Wattles Center on January 25, 2008. (Tr. 942.) It was noted that Claimant had been in jail since November 14, 2007 for aggravated assault with a deadly weapon and failure to carry a FOID card. (Tr. 942.) Claimant described the situation as a misunderstanding where he had been drinking and watching a movie and ended up waiving his deceased father's unloaded pistol at police officers. (Tr. 942.) He did

not recall having made any suicidal statements or threatening anyone. (Tr. 942.) Claimant was described as having depression, severe problems with anxiety and mania, severe health problems, and an alcohol problem that surpassed in severity and chronicity any of his mental health symptoms. (Tr. 942.) A summary of the assessment noted that Claimant did seem to have undertreated mental health issues, but that it was his alcohol dependence that led to the behavior that caused him to become involved with the criminal justice system. (Tr. 949.) It was noted that Claimant could benefit from more comprehensive adjunct mental health care. (Tr. 949.)

On March 12, 2008, Claimant saw Dr. Stevens for a follow-up visit. (Tr. 914.) No significant findings were noted but Dr. Stevens ordered laboratories on Claimant's lipids and a stress nuclear test. (Tr. 914.) The stress test did not appear to reveal any significant abnormalities beyond the observations previously made by Dr. Stevens. (Tr. 916.) A dobutamine cariodlite test revealed a small inferlateral infarction with small to moderate amount of peri-infarct ischemia and an ejection fraction of 53%. (Tr. 918.) An April 3, 2008 cardiac catheterization, left ventriculography, and coronary angiography revealed no significant findings, other than a 40% mild mid left anterior descending lesion. (Tr. 920.)

Claimant was also seen on April 3, 2008 for his sleep apnea by Dr. Amanda Law. (Tr. 954.) Claimant reported to Dr. Law that he had been intermittently using his auto BiPAP device, and the compliance data showed about a 50 percent compliance rate. (Tr. 954.) Claimant stated that he felt better when he used the device, but that his other symptoms, including his depression, caused him to use more alcohol and impaired his ability to put on the device at night. (Tr. 954.) Claimant was diagnosed with severe obstructive sleep apnea, and Dr. Law discussed with Claimant how the failure to use his BiPAP device increased his risk for heart attack, stroke,

arrhythmia, and worsening hypertension. (Tr. 955.)

On June 2, 2008, Claimant was admitted to Saint Anthony Medical Center with left-sided chest pain and epigastric pain. (Tr. 923.) Claimant was given nitroglycerin, morphine, and Dilaudid and ultimately admitted to the hospital. (Tr. 923.) On June 4, 2008, Claimant underwent a dobutamine myoview, which revealed abnormal images for the presence of inferior and inferolateral infarct and an ejection fraction of 54 percent. (Tr. 928.) On June 6, 2008, Claimant underwent an upper endoscopy with biopsy that revealed ulcerative esophagitis, suspected Barrett's esophagus, four gastric ulcers, and hemorrhagic gastritis. (Tr. 934.) Claimant was discharged on June 6, 2008. (Tr. 933.) Claimant returned to Saint Anthony on August 9, 2008 with similar symptoms and was discharged on August 12, 2008 with notations made about his June examination. (Tr. 1077.) Notations were also made regarding Claimant's alcoholism, withdrawal symptoms, and his need to follow-up for treatment. (Tr. 1077, 1080.)

On August 28, 2008, Claimant saw Dr. Adekola Ashaye, M.D., at Crusader Clinic. (Tr. 1010.) He was again found to have diabetes, dyslipidemia, coronary artery disease, and complained of foot pain. (Tr. 1010.) The notes indicate that he would be referred to a psychiatrist. (Tr. 1010.) On October 21, 2008, Claimant visited Crusader Clinic and underwent a foot X-Ray due to his left heel pain, which found his left foot to be normal. (Tr. 1012)

Claimant was admitted to Rockford Memorial Hospital on September 13, 2008 for chest pain and palpitations. (Tr. 974.) A CT Scan and EKG revealed nothing abnormal in light of Claimant's existing conditions, and he was discharged with a good prognosis on September 15, 2008.) Claimant was again admitted to Rockford Memorial on September 20, 2008 and was given a breathing treatment to treat wheezing, but was discharged without a diagnosis as to the

cause of his chest pain.  (Tr. 957-71.)

## V.  Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence.  42 U.S.C. § 405(g).  The ALJ's legal conclusions are reviewed de novo.  *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997).  However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]."  *Id.*  The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner.  *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").  The court may remand to the Commissioner where there is a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.  42 U.S.C. § 405(g).

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion."  *Binion*, 108 F.3d at 782.  If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence.  *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).  However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  *Steele v. Barnhart*,

290 F.3d 936, 940 (7th Cir. 2002).

**VI.     Framework for Decision**

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

**VII.    Analysis**

    **A.     Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?**

At Step One, the Commissioner determines whether the claimant is currently engaged in

substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ noted that Claimant made an "several unsuccessful work attempts after the alleged onset of disability," but found that Claimant had not engaged in substantial gainful activity since April 30, 2004, the alleged onset date." (Tr. 99.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B.      Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant has the following severe impairments: coronary artery disease, cardiomyopathy, intermittent alcohol-induced atrial fibrillation, diabetes, hypertension, anxiety, mood and personality disorders, and a history of alcohol abuse. (Tr. 99.) The ALJ also noted that Claimant had obstructive sleep apnea that was controlled with a CPAP device; knee problems without any recent complaints; obesity that contributes to Claimant's overall condition but not to such a degree that he would be

precluded from working; low back pain but with unremarkable findings by the consulting physician and only slightly decreased range of motion; and a heel spur and plantar fasciitis that was treated with an orthotic shoe insert. (Tr. 99-100.) The substantial evidence in the record supports the conclusion that Claimant had one or more severe impairments, and the parties do not dispute this determination. Therefore, the ALJ's Step Two determination is affirmed.

### C. Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. § 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 100.) The ALJ found that Claimant's cardiac impairments were not of a level of severity to satisfy 4.02, 4.04, or 4.05 of Appendix 1. (Tr. 100.) The ALJ also found that the severity of Claimant's diabetes did not satisfy the criteria set forth in section 9.08 because there were no records of neuropathy, retinopathy, or episodes of acidosis. (Tr. 100.) The ALJ considered Claimant's mental

impairments singly and in combination, and found that they do not meet or medically equal the criteria of listings 12.04, 12.08, and 12.09. (Tr. 100.) The ALJ found Claimant to have moderate restrictions in activities of daily living, social functioning, and concentration, persistence, or pace with no episodes of decompensation of extended duration. (Tr. 100-01.) Finally, the ALJ found that the "paragraph C" criteria were not satisfied because Claimant's condition had not resulted in such a marginal adjustment that even a minimal increase in mental demands or change in environment would be expected to cause decompensation, and there was no evidence of an inability to function outside a highly supportive living arrangement. (Tr. 101.)

The ALJ did not have Claimant's most recent medical records at the time he made this Step 3 determination. However, neither party challenged the ALJ's findings at Step 3, so the court will affirm the ALJ's determination and more thoroughly discuss the newly submitted evidence at Steps 4 and 5.

**D.     Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his limitations. *Id.* Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the

Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 404.1529(c).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); Soc. Sec. Rul. 82-62. If the claimant's RFC allows him to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ determined Claimant's RFC to be the following:

> The claimant has the residual functional capacity to perform
> sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and
> 416.967(a) except that he can lift 20 pounds occasionally and 10
> pounds frequently; stand 2 hours out of 8 and walk in divided

periods; and sit 6 hours out of 8 provided that he is permitted to stand at will. He must avoid unprotected heights and dangerous moving machinery and he is limited to simple routine tasks. (Tr. 101.)

In making his RFC determination, the ALJ indicated that he considered all of Claimant's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the medical evidence and other evidence. (Tr. 101.) The ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (Tr. 102.) The ALJ then had to consider the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities. Where statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence, a finding is made on the credibility of the statements based on a consideration of the entire record. The ALJ found Claimant's statements concerning intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC. (Tr. 102.)

Claimant makes a number of arguments disputing the ALJ's RFC finding. In addition, Claimant filed a supplementary motion for remand pursuant to Sentence 6 of 42 U.S.C. § 405(g), citing to the medical information that was not filed before the ALJ, but was filed with the Appeals Council. However, the ALJ ultimately found at Step Four that Claimant was unable to perform any past relevant work, and neither party disputes this finding. Therefore, the court will affirm the ALJ's Step Four finding and proceed to address any arguments or inconsistencies with the ALJ's RFC findings at Step Five.

**E.** **Step Five: Does Any Other Work Exist in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and**

**Vocational Factors?**

At Step Five, the Commissioner determines whether the claimant's RFC and vocational factors allow the claimant to perform any job which exists in the national economy in significant numbers. 20 C.F.R. § 404.1560(c). The burden is on the Commissioner to provide evidence that demonstrates that other work exists. 20 C.F.R. § 404.1560(c)(2). In determining whether other work exists, the Commissioner considers the claimant's RFC and vocational factors in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, subpt. P, app. 2 (the "Guidelines"). The Guidelines direct a conclusion of "disabled" or "not disabled" upon a finding of a specific vocational profile. Soc. Sec. Rul. 83-11. The Guidelines represent exertional maximums, though, and if the claimant cannot perform substantially all of the exertional demands contemplated by the Guidelines, a conclusion cannot be directed without first considering the additional exertional limitations. Soc. Sec. Rul. 83-11 & 83-12. A vocational expert's testimony, if it is reliable, can satisfy the Commissioner's burden of determining whether a significant number of jobs exist in the economy. *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008).

At Claimant's hearing, the ALJ incorporated his findings about Claimant's residual functional capacity into a series of hypothetical questions to the VE. The following is the exchange between the ALJ and the VE regarding Claimant's ability to do work:

> Q: Okay. Assume an individual the claimant's age, education and work experience, and assume further I were to find from the medical evidence that he could do the entire universe of exertional or non-exertional work with the exception that he be limited to 20 – lifting and carrying 20 pounds occasionally, 10 pounds frequently, could stand and walk two out of eight hours in divided periods. He could sit six out of eight hours being require (sic) a sit/stand option at will. Could not do – could not work around unprotected heights,

dangerous moving machinery. I'm going to limit him to simple, routine tasks, only occasional contact with the general public, coworkers and supervisors. Okay, can he return to his past relevant work?

A: No, Sir.

Q: Are there other jobs he can do?

A: Obviously would eliminate any transferable skills because of the –

Q: Um-hum.

A: Condition of unskilled work only.

Q: Right.

A: And only occasional contact with coworkers, general public, supervisors with the sit/stand option and at – total standing only two hours a day. And restrictions from heights and no moving machinery would eliminate all certainly production jobs. (INAUDIBLE) cashier positions. I don't know that I can cite to any jobs, Your Honor.

Q: Okay. If I eliminate the restriction on contact to the general public and coworkers, would that change your answer?

A: It would, yes.

(Tr. 147-48.) The VE went on to explain that the Claimant would be capable of performing production jobs such as assembly, packaging, visual inspection, and cashier positions, of which there are at least 3,000 in each category in the State of Illinois. (Tr. 148.) When questioned by Claimant's counsel, the VE testified that a person would not be able to perform the above-named jobs if he were only able to sit for 15 minutes at a time. The VE also testified that the tolerable absenteeism for the named jobs is "not more than a day to a day-and-a-half a month on a regular basis because of the fact that these are unskilled jobs." (Tr. 149.)

After the hearing, Claimant apparently submitted some additional medical evidence. (Tr.

25

1094.)  The ALJ then sent interrogatories to the ME, Dr. Dougherty, asking a number of follow-up questions.  (Tr. 1094.)  Among the questions, the ALJ asked the ME what he believed Claimant's functional limitations to be in light of the new evidence.  (Tr. 1094.)  On January 9, 2009, the ME answered the interrogatory with the following:

> From a functional point of view, in view of his proven coronary artery disease I do not feel that he could be expected to stand and walk for 2 hours in an 8 hour work day therefore he would be limited to sedentary work.  I would limit his lifting to 10 pounds frequently and 20 pounds occasionally and would limit his carrying to 10 pounds.  I also still feel that he should have a sit/stand option and in view of the new evidence my opinion has not changed.

(Tr. 1092.)  It is not clear from the record exactly which additional medical documents were submitted to the ALJ, but it is significant that the ME opined that Claimant could not be expected to stand and walk for 2 hours in an 8 hour work day.  This opinion deviates from the ALJ's hypothetical to the VE during the hearing.

The hypothetical posed to the VE also suggested that the Claimant could perform "the entire universe of exertional or non-exertional work" with the exception of the specific exertional limitations listed by the ALJ, including lifting 20 pounds occasionally and 10 pounds frequently.  Again, the ME twice testified that the Claimant would only be capable of sedentary work with the limitation that he lift 10 pounds frequently and 20 pounds occasionally.  Sedentary work is defined by the SSA as containing a limitation to lifting no more than 10 pounds at a time.  42 U.S.C. § 404.1567(a).  The definition of light work contains a limitation of lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  42 U.S.C. § 404.1567(b).  There seems to be confusion as to whether Claimant is capable of sedentary work, light work, or something in between.  Adding to the confusion, the

ME testified at the hearing that Claimant could stand for two hours out of an eight hour day with a sit/stand option, then revised this testimony in his response to the ALJ's interrogatories after the hearing.

The ALJ ultimately arrived at an RFC assessment that was consistent with the modified hypothetical posed to the VE, which removed any restrictions on the Claimant's interactions with the public, co-workers, or supervisors. The only explanation discernable from the ALJ's opinion is that Claimant's various mental health complaints were primarily caused by Claimant's binge drinking. (Tr. 103.) The ALJ specifically addressed Claimant's depression and mood swings as being correlated with alcohol abuse, but there is no discussion of Claimant's anxiety disorder or other clinical findings such as a GAF score of 53. As the ALJ noted, the "paragraph B" criteria do not comprise a mental residual functional capacity assessment. Rather, the ALJ should consider whether the Claimant has a reduced capacity to perform specific mental activities encompassed by the "paragraph B"criteria and generally required for competitive, remunerative, unskilled work. SSR 96-9p. The categories include understanding, remembering, and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled work; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. The ALJ did limit Claimant to simple routine tasks in his RFC, but offered no findings as to the other categories. Nor did the ALJ provide an explanation for why the limitation on Claimant's ability to interact with the public, co-workers, or supervisors was removed from the second hypothetical posed to the ALJ and not included in his RFC.

The ALJ did not elaborate on whether the combined effects of Claimant's impairments

were considered. The ALJ opinion contains no mention of Claimant's reflux esophigitis and ulcers, which appear as a diagnosis repeatedly in Claimant's medical record and which was discussed by the ME specifically at Claimant's hearing. The ME testified that the combination of Claimant's heart condition and acid reflux disease led to hospitalizations because of an inability to distinguish between the symptoms. (Tr. 137.) The ME also noted that Claimant's described fatigue could be attributed to Claimant's heart condition in combination with his weight. (Tr. 138.) At the same time, the ME stated that it would be "very hard" for Claimant to exercise because of his cardiac condition. (Tr. 138.) When referring to Claimant's psychiatric problems, the ME testified that "there's undoubtedly a psychiatric component in here, but how much weight there is to that I don't know ... if I had his problems, I think I'd be depressed too." (Tr. 138.) The ME added that he did not believe any of Claimant's conditions rose to a listings level, but that he wondered about the combination of factors. (Tr. 138.) The ME's testimony regarding the interplay between Claimant's conditions is amply supported by the medical record, which includes numerous medical appointments and hospital stays related to Claimant's overlapping conditions of coronary artery disease, acid reflux disease, diabetes and related foot problems, mental health problems, sleep apnea, leg pain, and obesity. The ALJ was required to consider the combined effect of all of Claimant's impairments or ailments. 42 U.S.C. § 404.1523; *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). Instead, the ALJ appears to have focused on Claimant's coronary artery disease, depression, and mood swings – and the effect that Claimant's alcohol use had on each – in arriving at the conclusion that Claimant's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's RFC.

In addition to the above, the ALJ's opinion did not address the statement made by the VE that Claimant could only miss one to one-and-a-half days per month on a regular basis. The medical evidence in the record and the ME's testimony make clear that Claimant is subject to frequent medical visits for his various conditions. As the ME noted, when Claimant experiences chest pain related to his acid reflux disease, he is sometimes admitted to the hospital for a number of days based on his history of coronary artery disease. Claimant testified that at least one of his work attempts was cut short by a medical problem and hospital stay.

Where an individual is found to be capable of less than the full range of sedentary work, an accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base. SSR 96-9p. The occupational base may be eroded by such limitations as standing for slightly less than two hours out of an eight hour workday, the need to alternate sitting and standing, environmental restrictions, and mental limitations or restrictions. As described herein, there appears to be some confusion or discrepancy between the medical evidence in the record, the testimony of the medical expert, and the hypothetical posed to the VE that the ALJ ultimately relied upon. Though there is evidence in the record to support some of the ALJ's conclusions, the ME's testimony and substantial evidence in the record cast doubt on whether the combined effects of Claimant's ailments were fully considered. Therefore, it cannot be said that the ALJ created a logical bridge between the medical evidence in the record and his ultimate determination. For the foregoing reasons, Plaintiff's motion for summary judgment will be granted and this case will be remanded.

The court finds it prudent to raise two additional issues to be considered on remand. The first relates to Claimant's alcohol addiction as a contributing factor to his disability. The ALJ

correctly noted that there is substantial evidence to indicate that Claimant's binge drinking aggravated several of his conditions. The ALJ's finding as to Claimant's alcoholism, which the Commissioner described in his motion for summary judgment as implicit, did not provide a complete analysis. In order to use the alcohol addition as a reason to deny Claimant's claim, the ALJ must determine which of Claimant's conditions would remain if he ceased his use of alcohol, and whether those remaining conditions would be disabling. 42 U.S.C. § 1535. Upon remand, it would be appropriate for the Commissioner to make a finding as to whether Claimant's alcoholism is a contributing factor material to the determination of disability.

The second issue to be considered on remand relates to Claimant's supplementary motion for a remand as a result of medical evidence submitted after his hearing before the ALJ. The materials should be considered on remand if they contain new evidence that is material and where there is good cause for the failure to incorporate the evidence into the record in prior proceedings. 42 U.S.C. § 405(g). The evidence submitted by Claimant is new, as the hospitalizations described in the record took place between the time of Claimant's hearing and the ALJ's opinion. There also appears to be good cause for Claimant's failure to incorporate the evidence sooner, as the new records were submitted to the Appeals Council as soon as they were provided from the medical providers. The evidence is material if there is a reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered. *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999).

One set of medical records describes a hospitalization in January 2009 related to chest pains. (Tr. 65.) A diagnostic work-up of Claimant's coronary condition revealed the possibility of an inferior infarction and possible inferolateral ischemia. (Tr. 68.) The second set of records

refers to a two-night hospitalization between March 27, 2009 and March 29, 2009 where Claimant complained of chest pain, hallucinations, cough, shortness of breath, and recently diagnosed pneumonia. (Tr. 8.) Claimant was then referred from Swedish American Heart Hospital to the Swedish American Center for Mental Health with depression, some passive suicidal ideation, and active auditory and visual hallucinations. (Tr. 10.) Claimant was discharged on April 1, 2009 with some changes in his medication. (Tr. 56.) The court finds this information to be material to the ALJ's considerations of the combined effects of Claimant's conditions. It may also be relevant to the VE's testimony that Claimant could only miss one to one-and-a-half days of work at the jobs listed. The court finds that this evidence should be considered on remand.

## VIII.  Conclusion

For the forgoing reasons, Claimant's motions for summary judgment and for remand are granted, and the Commissioner's motion for summary judgment is denied. This matter is remanded for a hearing in conformity with this opinion.

E N T E R:

_____

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: August 5, 2011